JOSEPH R. GARRY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 51904.    Filed May 9, 1955.

*John W. Cragun, Esq.*, and *Robert W. Barker, Esq.*, for the petitioner.

*Wm. Schwerdtfeger, Esq.*, for the respondent.

### OPINION.

WITHEY, *Judge:* The respondent has determined a deficiency of $195.60 in the petitioner's income tax for 1951. Issues presented by the pleadings are the correctness of the respondent's action (1) in including in taxable income the amount of $1,528.48 representing income received from the sale of grain grown on allotted Indian lands on the Coeur d'Alene Reservation in Idaho, and (2) in failing to determine that income in the amount of $713.63 received from military service was excludable from taxable income. Issue 2 has been disposed of by stipulation of the parties.

All of the facts have been stipulated and are found accordingly.

Petitioner is an American Indian, duly enrolled as a member of the Kalispel Tribe, residing at Plummer, Idaho. His income tax return for 1951 was filed with the collector of internal revenue at Boise, Idaho.

In 1951 petitioner received income in the amount of $1,528.48 from the sale of grain grown on the lands referred to below. In his return petitioner showed the income as having been received as rents but claimed its exemption from taxation and did not include it in gross income.

The lands on which the grain was grown were lands held in trust by the United States for petitioner and other heirs of the original Indian allottees within the Coeur d'Alene Reservation, in Benewah and Kootenai Counties, Idaho. The Coeur d'Alene Reservation was established pursuant to Agreements of March 26, 1887, and September 9, 1889, which were ratified by an Act of Congress on March 3, 1891, 26 Stat. 989, 1026–1032.

The agreement with the Coeur d'Alene Tribe of March 26, 1887, ratified by an Act of Congress on March 3, 1891, 26 Stat. 989, 1026–1029, provided, in part, as follows:

### ARTICLE 1.

Whereas said Coeur d'Alene Indians were formerly possessed of a large and valuable tract of land lying in the Territories of Washington, Idaho, and Montana, and whereas said Indians have never ceded the same to the United States, but the same, with the exception of the present Coeur d'Alene Reservation, is held by the United States and settlers and owners deriving title from the United States, and whereas said Indians have received no compensation for said land from the United States: Therefore,

## ARTICLE 2.

For the consideration hereinafter stated the said Coeur d'Alene Indians hereby cede, grant, relinquish, and quitclaim to the United States all right, title, and claim which they now have, or ever had, to all lands in said Territories and elsewhere, except the portion of land within the boundaries of their present reservation in the Territory of Idaho, known as the Coeur d'Alene Reservation.

  *   *   *   *   *   *    *

## ARTICLE 5.

In consideration of the foregoing cession and agreements, it is agreed that the Coeur d'Alene Reservation shall be held forever as Indian land and as homes for the Coeur d'Alene Indians, now residing on said reservation, and the Spokane or other Indians who may be removed to said reservation under this agreement, and their posterity; and no part of said reservation shall ever be sold, occupied, open to white settlement, or otherwise disposed of without the consent of the Indians residing on said reservation.

The Agreement of 1889 ceded a further portion of the lands earlier specifically reserved (26 Stat. 1030, Art. 1).

The lands upon which the grain was grown were allotted to the original Indian allottees pursuant to the terms of the General Allotment Act of February 8, 1887, 24 Stat. 388, and are owned by the United States in trust for petitioner and other heirs of the original allottees. The trust period with respect to such lands has been extended from time to time and still exists as to them.

The petitioner concedes that as a citizen of the United States he, like others, who had such income, was subject to tax on his income from teaching but takes the position that he was not taxable on the income realized by him from the sale of grain produced on the Coeur d'Alene Reservation. In support of his position the petitioner contends, in effect, that the lands upon which the grain was produced are to be regarded as lands situated within the jurisdiction of a foreign government and, for that reason, the power of Congress to impose a tax on the income derived from them should not be implied. Granting, but not deciding, that the lands in question are to be regarded as petitioner contends, the petitioner is not aided here. In *Cook* v. *Tait*, 265 U. S. 47, it was held that Congress has the power to impose a tax on the income of a citizen of the United States who at the time the income was received was permanently resident and domiciled in Mexico, the income having been derived from real and personal property situated there. In so holding, the Supreme Court stated that the basis of the power to tax was "upon his [the taxpayer's] relation as citizen to the United States and the relation of the latter to him as citizen." In view of the foregoing, and since the petitioner is a citizen of the United States, his contention clearly is without any weight.

The petitioner further contends that in general the income tax laws are not applicable to income received by restricted Indians from restricted property unless such laws are so expressed as clearly to manifest an intention that they are to be so applicable, or, in other words, the general provisions of the income tax laws do not apply to such income and that special acts or provisions are required in order to make such income taxable. *Blackbird* v. *Commissioner*, 38 F. 2d 976, and *United States* v. *Homeratha*, 40 F. 2d 305 (decided on authority of *Blackbird* v. *Commissioner*, *supra*), appeal dismissed 49 F. 2d 1086, are cited in support of the contention. *Superintendent of Five Civilized Tribes* v. *Commissioner*, 295 U. S. 418, involving the taxability of income derived from investment of funds arising from restricted lands belonging to a Creek Indian, came before the Supreme Court on certiorari to the Court of Appeals for the Tenth Circuit which also had decided the *Blackbird* case. In the *Five Civilized Tribes* case, it was contended before the Supreme Court that in deciding that case the Court of Appeals for the Tenth Circuit should have followed the rule which it applied in the *Blackbird* case. However, the Supreme Court pointed out that what was said by the Court of Appeals in the *Blackbird* case did not harmonize with what subsequently had been said by the Supreme Court in *Choteau* v. *Burnet*, 283 U. S. 691, and stated that the Court of Appeals properly declined to follow its pronouncement in the *Blackbird* case. The Supreme Court further said:

The general terms of the taxing act include the income under consideration, and if exemption exists it must derive plainly from agreements with the Creeks or some Act of Congress dealing with their affairs.

Finding nothing in the agreements with the Creeks or in acts of Congress dealing with their affairs which provided an exemption, the Supreme Court affirmed the action of the Court of Appeals in holding that the income was taxable. Since in so holding the Supreme Court rejected the holding and reasoning of the *Blackbird* and *Homeratha* cases, those cases can no longer be regarded as authority for the proposition for which the petitioner cites them here.

Relying on the decision in *Capoeman* v. *United States*, (W. D., Wash.) 110 F. Supp. 924, affirmed sub nom. *Squire* v. *Capoeman*, (C. A. 9) 220 F. 2d 349, the petitioner contends that, since the General Allotment Act of February 8, 1887, provides that the United States at the end of the trust period will convey allotted lands "in fee, discharged of said trust and free of all charge or incumbrance whatsoever," the income in question is not subject to tax. In the *Capoeman* case the taxpayers, husband and wife, were unemancipated members of the Quinaielt Indian Tribe and citizens of the United States and resided on the Quinaielt Reservation. Under the pro-

visions of the Quinaielt Treaty with the United States, dated July 1, 1855, and January 25, 1856, the Quinaielt Indian tribal lands were transferred to the United States, but there was reserved therefrom and set apart for the exclusive use of the members of that tribe an area designated in accordance with the terms of the treaty. In 1907, pursuant to the terms of the treaty and the General Allotment Act of February 8, 1887, a trust patent was issued to the husband for certain tribal land within the Quinaielt Reservation. Fee title to the land was, and still is, held by the United States in trust for him. During 1943, pursuant to a contract of sale entered into by the Bureau of Indian Affairs of the United States Department of Interior providing for the cutting and sale of timber from his allotment, certain timber, constituting the chief value of the land, was cut, sold, and paid for. A minor portion of the proceeds was distributed to the taxpayers and the remainder was placed in trust by the United States and maintained, subject to withdrawal solely by or for their use and benefit, in an account for the taxpayers. The question before the court was whether the taxpayers were subject to tax on long-term capital gain from the sale of the timber. Concluding that by the arrangements under which the United States held the land in trust, it was without power to levy a charge upon the land, or upon the sale of part or all of it, the District Court held that the sale of the timber was to be considered as a sale of part of the land and that the taxpayers were not subject to tax on any capital gain derived from the sale. In so holding, the District Court said:

This holding is not inconsistent with decisions that the proceeds of fructus industriales such as grasses cut from the land or the fruits of fisheries appurtenant can be taxed. There no portion of the corpus of the trust is taxed, but only the profit therefrom. * * *

In a footnote to its opinion, the District Court stated that, under its analysis, *Jones* v. *Taunah*, (C. A. 10) 186 F. 2d 445, certiorari denied 341 U. S. 904, among others, was distinguishable and had no application to the instant case.

In affirming the holding of the District Court in the *Capoeman* case, the Court of Appeals, after stating that it agreed with the conclusion of the District Court and in the main with the reasons given for it, said:

We may add that while the court below appeared to regard as distinguishable the decision of the Tenth Circuit in the cognate case of Jones v. Taunah, 186 F. 2d 445, we see no ground upon which the holding can be distinguished. Rather, we agree with the dissenting opinion of Chief Judge Phillips.

In *Jones* v. *Taunah, supra*, the taxpayers, husband and wife, restricted Comanche Indians, received income, some from oil lease bonus, some from oil and gas rentals and royalties, and some from agricultural leases or agricultural activities, on certain lands, some of

which had been allotted to the taxpayers and some of which had been inherited by them, but all of which were held in trust for them by the United States and which at the expiration of the trust period were to be conveyed in fee simple to the allottees or their heirs free of all encumbrances. A majority of the court concluded that none of the income in question was exempt from income tax under Federal law. Chief Judge Phillips ended his dissenting opinion with the following statement:

> For the reasons indicated I would hold that the royalties derived from leases on the original allotments are not subject to Federal income tax, but that interest earned by investment of royalty funds, agricultural income and royalty income from inherited lands are subject to Federal income tax.

In view of the statement made by the Court of Appeals for the Ninth Circuit in the *Capoeman* case respecting the dissenting opinion of Chief Judge Phillips in *Jones* v. *Taunah* and in view of the statement made by him in the latter case, it appears that the Courts of Appeals for the Ninth and Tenth Circuits are in agreement that income from agricultural leases, or from agricultural activities, on restricted Indian lands is not exempt from the Federal income tax but is subject to it. From the foregoing, it is apparent that instead of the *Capoeman* case supporting the petitioner's position here it supports the respondent's determination. In view of what has been said above, the petitioner's contention must be denied.

Since the petitioner has not cited us to, nor have we found, any act of Congress, or agreement between his general ancestors, his tribe, or himself and the United States granting exemption to the income here involved, we sustain the respondent's determination. See *Charles Strom*, 6 T. C. 621, affd. 158 F. 2d 520.

*Decision will be entered under Rule 50.*