Julia NICODEMUS, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 1898.

United States District Court
D. Idaho, N. D.

June 15, 1955.

Malott, Dellwo & Rudolf, Spokane, Wash., Wm. D. McFarland, Coeur d'Alene, Idaho, for plaintiff.

H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe and Roger M. Stuart, Jr., Sp. Assts. to the Atty. Gen., Sherman F. Furey, Jr., U. S. Atty., John T. Hawley, Asst. U. S. Atty., Boise, Idaho, for defendant.

CLARK, Chief Judge.

This matter was submitted to the Court herein on a stipulation of facts filed herein on the 16th day of March, 1954. Thereafter an offer of proof was made by the plaintiff and the offer of proof was admitted over the objection of the government, and the matter was taken under advisement. This court by memorandum opinion, following the opinion in the case of Jones v. Taunah, decided by the Tenth Circuit, 186 F.2d 445, held in favor of the government and against the plaintiff. Before the findings of fact and judgment were prepared and signed by the court, the Ninth Circuit had before it the case of Squire v. Capoeman, 220 F.2d 349, 350, and this court, having had the opportunity to read the briefs filed in that case recalled its memorandum opinion, pending the decision of the Court of Appeals of the Ninth Circuit in that case. The Ninth Circuit Court of Appeals affirmed the opinion of the court below, and had the following to say with regards thereto:

"The opinion of the trial judge is reported in [Capoeman v. United States, D.C.] 110 F.Supp. 924. Inasmuch as we agree with the judge's holding and in the main with the reasons given for it, no useful purpose would be served by our again plowing that field. Enough to say that in our view this attempt to tax evidences, at the least, a sorry breach of faith with these Indians. We may add that while the court below appeared to regard as distinguishable the decision of the Tenth Circuit in the cognate case of Jones v. Taunah, 186 F.2d 445, we see no ground upon which the holding can be distinguished. Rather, we agree with the dissenting opinion of Chief Judge Phillips."

In reading the dissenting opinion of Chief Judge Phillips, above referred to,

the question now before this Court is not directly passed upon, although Judge Phillips did not question the propriety of taxation of agricultural income or royalty income from inherited lands. He states at page 450 of 186 F.2d, "For the reasons indicated I would hold that the royalties derived from leases on the original allotments are not subject to Federal income tax, but that interest earned by investment of royalty funds, agricultural income and royalty income from inherited lands are subject to Federal income tax."

The land in question here from which the crops were grown are allotted lands. These allotted lands were set aside to be held forever as Indian lands and it was agreed that no part of said reservation should ever be sold, occupied, open to white settlement, or otherwise disposed of, without the consent of the Indians residing on said reservations; that subsequent application of allotment acts to be effective would have to be made with the consent and agreement of the Indians, and carried with it a contractual obligation of the Government to hold said lands free from such obligation during the trust period and its extension.

This has been recognized through the years and the testimony of the Indians in support of their contention is that not only did the government through the years recognize the validity of their understanding but through its Indian agents and official documents, among which was the *Handbook of Indian Law* furnished by the Department of Interior, fully advised the Indians that their interpretation was correct.

Right at the threshold of this inquiry we have to look into the past: Our past history has demonstrated the desire of the Federal Power to protect Indians. Much has been said in opinions of the Court heretofore rendered, as to our duties to protect this helpless and dependent people, and this is the just rule to follow. This great race of people has been depleted in numbers; they are helpless; they are under the political power and control of the government of the United States; they are its wards; it is the government's duty, as long as the wardship over the Indians exists, to proceed to protect the Indian lands, and in cases such as this, to assert their exemption from taxation, if the circumstances warrant.

Judge Phillips, of the Tenth Circuit, in the case of Jones v. Taunah, hereinbefore referred to, cites the case of United States v. Rickert, 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532, as follows:

"'* * * the court held that lands allotted under the General Allotment Act were exempt from state taxation during the trust period. One of the grounds upon which the decision rested is that to tax such lands during the trust period would be to tax an instrumentality of the United States. Another ground was stated by the court, as follows: 'So that if they may be taxed, then the obligations which the government has assumed in reference to these Indians may be entirely defeated; for by the act of 1887 the government has agreed at a named time to convey the land to the allottee in fee, discharged of the trust, "and free of all charge or encumbrances whatsoever." To say that these lands may be assessed and taxed by the county of Roberts under the authority of the State is to say they may be sold for the taxes, and thus become so burdened that the United States could not discharge its obligations to the Indians without itself paying the taxes imposed from year to year, and thereby keeping the lands free from encumbrances.'"

The Government contends that the Indian status as a ward of the government provides no valid reason for excluding his income from the scope of the taxing statutes, and advance the theory that it was the intent of Congress to levy the tax with respect to all residents of the United States, and upon all sorts of income, and that there is no exception exempting the sort of income here

involved. The most that can be said about the statute is that it is broad enough to include all citizens; however, it does not use the words "including Indians". It is reasonable to say that Congress gave no thought to the Indians at all. They must have had in mind, as stated in plaintiff's brief, the history of the dealings, the treaties and agreements the United States made with the vanquished Indians prior to the passage of this act. Certainly the Indians were not consulted, nor did they have any opportunity to assert their rights under their agreements and understandings that were in full force and effect at the time of the passage of this act. When these agreements were first made with the Indians it was with the thought in mind that the negotiations should be fair. The government of the United States was represented at the counsel table with the superiorly equipped race. They dictated the terms the Indians had to accept. There can be no question that the Indians were unable to interpret the agreements and were more or less coerced in making them, and we find, upon investigation, that the agreements were generally signed with an "X" mark, witnessed by the Indian agent, and as contended by the plaintiff, there is no evidence of any contribution made to the agreement by a single Indian, or any change in it at the conference where it was supposedly negotiated. Are we going to say that the Government will take advantage of the general statement in the income tax bill that all citizens and residents are taxed, to the disadvantage of an illiterate and uneducated people? They are still treated as incompetent wards of the Indian Bureau, and leases are prepared and negotiated and their rentals collected by the Indian Agencies.

If they may now be taxed, then the obligation which the government has assumed in reference to these Indians may be entirely defeated because it cannot be questioned that if the income tax is assessed against them, and is not paid, it would become a lien upon their lands and would not be "free of all charge or incumbrance whatsoever".

The position taken by the government in this case would be to blow hot and cold in the same breath, one admitting that their allotment act was exempt from taxation and the other to say that they could lose this allotment through another tax levied on crops grown on the allotted lands, and lose their allotment through failure to pay the tax.

There are numerous cases from appellate courts touching on this question, the latest we find being from the Ninth Circuit. The Supreme Court of the United States had not spoken on this particular question.

Here we have as plaintiff in this case, an aged Indian woman who lives alone with her son near Tekoa, Washington, and who has typical land holdings. For that reason this tax case is a typical, or test case. It does not affect Julia Nicodemus alone. The decision of the Court will affect every Indian allottee in the country. This is, in effect, a test case to declare the law applying to thousands of allottees and millions of acres of similar allotments.

As is evident from Paragraphs VIII of the stipulation of facts, Julia Nicodemus is a full-blooded Coeur d' Alene Indian, and has held a quantity of land on the reservation either by original trust patent or by inheritance from the original allottee.

Mrs. Nicodemus held this land for practically all her life and, like all the rest of her fellow allottees on her reservation, at no time reported the rental income from her land for income tax purposes. All of the Indians of her reservation believed said income to be tax exempt and "For the allottees' sole use and benefit." Suddenly, after all these years, on October 1, 1949, the Bureau of Internal Revenue attached and collected $3,116.85 from the tenant out of rentals due Mrs. Nicodemus from her trust property for that year. This was to cover alleged tax deficiencies on said income (plus penalties) for 1946 and 1948. This case is a suit by Mrs.

Nicodemus to recover this $3,116.85 on the grounds that, the trust property being non-taxable and for her use and benefit, the income therefore is non-taxable and for her sole use and benefit. Allegedly delinquent income tax of subsequent income from the same property has been accumulating for all the subsequent years, and liens filed by the Bureau of Internal Revenue have tied up all of this income.

Is she equal under the law or must the white man's law making all residents subject to income tax, where she is not particularly mentioned in it, mean that the Indians are citizens just like everyone else and there is no reason why they should not expect to pay taxes on their income as other citizens do, and if they don't pay, have liens filed against their allotted lands, and lose their lands so that the government could not discharge its obligation to them, whereby they promised to keep their lands free from the imposition of taxes. The plaintiff in this case, no doubt, did not understand anything about the agreements made with the white man. She was advised and all the Indians were advised that the lands were not subject to tax, even though at a later date it is contended that these agreements were made with the authority to bind the United States government.

During all the past years they were not even required to file an income tax return, and understood that their income was not taxable and then suddenly, out of a clear sky, they say to the plaintiff in this case "It makes no difference whether our ward be reduced to poverty and lose her lands, the taxes must be paid." The Indians are entitled to receive and keep their lands free of all charge and encumbrance whatsoever and this Court, having no exact rule to follow laid down by courts of superior jurisdiction, is of the opinion that taxation of income from trust property as in the present case, would be in violation of the government's agreements with the Indians and that the income involved in this action is exempt from taxation, and that this court should not permit an injustice such as this when the income tax statute in question has never been held to apply to Indians for a period of 35 years, and during which time the Indians have been lulled into security that their property held in trust by the government is free from taxation.

Counsel for plaintiff may prepare findings of fact, conclusions of law and judgment in accordance with this memorandum opinion, submitting the original to the Court and serving a copy on opposing counsel.